UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FAIR LINES AMERICA ) <br> FOUNDATION INC., ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> US DEPARTMENT ) <br> OF COMMERCE, *et al.*, ) <br> ) <br> Defendants. ) <br> ) | Civil Action No. 21-1361 (ABJ) |

**MEMORANDUM OPINION**

Fair Lines America Foundation, Inc. brought this Freedom of Information Act ("FOIA") lawsuit against the Bureau of the Census and Department of Commerce on May 18, 2021. *See* Compl. [Dkt. # 1]. Both parties have filed motions for summary judgment. *See* Mem. of P. & A. in Supp. of Defs.' Mot for Summ. J. [Dkt. # 13-1] ("Defs.' Mot"); Mem. of P. & A. in Supp. of Pl.'s Combined Opp. to Defs.' Mot. and Cross-Mot. for Summ. J. [Dkt. # 14-1] ("Pl.'s Mot."). The motions are fully briefed. *See* Defs.' Reply in Supp. of Defs.' Mot. and Opp. to Pl.'s Mot. [Dkt. # 17] ("Defs.' Reply"); Pl.'s Reply in Supp. of Pl.'s Mot. [Dkt. # 19] ("Pl.'s Reply"). For the following reasons, plaintiff's motion will be **DENIED**, and defendants' motion will be **GRANTED**.

**BACKGROUND**

Every ten years, defendants are tasked with conducting the census: a count of the population of the United States. This duty is mandated by the United States Constitution, which "requires an 'actual Enumeration' of the population every 10 years and vests Congress with the

1

authority to conduct that census 'in such Manner as they shall by Law direct.'" *Wisconsin v. City of New York*, 517 U.S. 1, 5 (1996), quoting U.S. Const. art. I, § 2, cl. 3.

Defendants conducted the most recent census in the year 2020. As the Supreme Court has recognized, the census is a massive undertaking, but it is inevitably imperfect. "Although each [census] was designed with the goal of accomplishing an 'actual Enumeration' of the population, no census is recognized as having been wholly successful in achieving that goal." *Wisconsin*, 517 U.S. at 6.

> Despite consistent efforts to improve the quality of the count, errors persist. Persons who should have been counted are not counted at all or are counted at the wrong location; persons who should not have been counted (whether because they died before or were born after the decennial census date, because they were not a resident of the country, or because they did not exist) are counted; and persons who should have been counted only once are counted twice.

*Id.* One particular issue is that a lack of responses can – and inevitably does – lead to an "undercount" of the population. *Id.* at 7. "The Census Bureau has recognized the undercount as . . . [a] significant problem[], and in the past has devoted substantial effort toward achieving [its] reduction." *Id.* With this goal in mind, the Census Bureau does not simply rely on survey responses to count the population; it has devised methods to improve the accuracy of its count and to avoid undercounting.

One of these methods is that the Bureau "imputes" numbers based on other information it has collected. The Supreme Court has explained that the Census Bureau utilizes

> different kinds of "imputation" depending upon the nature of the missing or confusing information. Where, for example, the missing or confused information concerns the existence of a housing unit, the Bureau speaks of "status imputation." Where the missing or confused information concerns whether a unit is vacant or occupied, the Bureau speaks of "occupancy imputation." And where the missing or confused information concerns the number of people living in a unit, the Bureau refers to "household size

> imputation." In each case, however, the Bureau proceeds in a somewhat similar way: It imputes the relevant information by inferring that the address or unit about which it is uncertain has the same population characteristics as those of a "nearby sample or 'donor'" address or unit — *e.g.,* its "geographically closest neighbor of the same type (*i.e.,* apartment or single-family dwelling) that did not return a census questionnaire" by mail.

*Utah v. Evans*, 536 U.S. 452, 458 (2002) (emphasis omitted).

One way defendants sought to obtain an accurate count in 2020 was a methodology called "Group Quarters Count Imputation" ("GQCI"). Pl.'s Mot. at 1. Defendants describe "group quarters" as

> places where people live or stay in a group living arrangement that is owned or managed by an organization providing housing and/or services for the residents. Group quarters differ from typical household living arrangements because the people living in them are usually not related to one another. Group quarters include such places as college residence halls, residential treatment centers, skilled nursing facilities, group homes, military barracks, prisons, and worker dormitories.

Second Decl. of John M. Abowd, Ex. 1 to Defs.' Mot. [Dkt. # 13-3] ("Abowd Decl.") ¶ 63.[1] After defendants' "review indicated anomalies" in its count of group quarters, *id.* ¶ 64, they

> used processing information from the group quarters enumeration records, group quarters advance contact records, and administrative data to determine whether records were double counted, appropriately counted, or missing. The GQCI resolved the status of group quarters addresses for frame eligibility (occupied or not; unoccupied group quarters are deleted from the census frame) and, if occupied, the status of persons residing in the group quarters—eliminating duplicates and imputing missing persons.

*Id.* ¶ 66.

"Due to its concerns about the Census Bureau's lack of transparency in its methodology, Plaintiff filed a FOIA Request seeking information to help inform the public about the impact of

---

1    John Abowd is "the Chief Scientist and Associate Director for Research and Methodology at the United States Census Bureau." Abowd Decl. ¶ 1.

GQCI on the 2020 Census, as well as the extent to which it was employed in the enumeration." Pl.'s Mot. at 2. The original FOIA request has been narrowed down throughout this litigation, and now plaintiff "only seeks documents identifying the total population (number of individuals) imputed statewide by the Census Bureau for group quarters for each U.S. state." *Id.* (internal quotation marks and citation omitted). In short, plaintiff wishes to know how many individuals were imputed by the GQCI process in each state.

Defendants object to producing this information and argue that FOIA Exemption 3 applies. Exemption 3 states that FOIA "does not apply to matters that are specifically exempted from disclosure by statute . . . if that statute requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue." 5 U.S.C. § 552(b)(3)(A)(i).[2] Defendants' position is that "the Census Act's confidentiality provisions, 13 U.S.C. §§ 8(b) & 9," Defs.' Mot. at 1, require that they not produce the requested information because its release would inevitably allow third parties to "reconstruct[]" the larger dataset and then identify the private information of individual people counted. *Id.* at 21.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v.*

---

2   There are other subsections of Exemption 3, but defendants rely on the portion of Exemption 3 related to statutes allowing for no discretion. *See* Defs.' Mot. at 1.

*Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  To defeat summary judgment, the non-moving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted).  When the court is presented with cross-motions for summary judgment, it analyzes the underlying facts and inferences in each party's motion in the light most favorable to the non-moving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

The mere existence of a factual dispute is insufficient to preclude summary judgment.  *Anderson*, 477 U.S. at 247–48.  A dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is "material" only if it is capable of affecting the outcome of the litigation.  *Id.* at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987).  In the FOIA context, "the sufficiency of the agency's identification or retrieval procedure" must be "genuinely in issue" in order for summary judgment to be inappropriate.  *Weisberg v. DOJ*, 627 F.2d 365, 371 n.54 (D.C. Cir. 1980), quoting *Founding Church of Scientology v. NSA*, 610 F.2d 824, 836 (D.C. Cir. 1979) (internal quotation marks omitted).

"[S]ummary judgment may be granted on the basis of agency affidavits" in FOIA cases, when those affidavits "contain reasonable specificity of detail rather than merely conclusory statements," and when "they are not called into question by contradictory evidence in the record or by evidence of agency bad faith."  *Jud. Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 215 (D.C. Cir. 2013), quoting *Consumer Fed'n of Am. v. Dep't of Agric.*, 455 F.3d 283, 287 (D.C. Cir. 2006).  *See also Chambers v. Dep't of Interior*, 568 F.3d 998, 1003 (D.C. Cir. 2009) ("In a suit seeking agency documents—whether under the Privacy Act or FOIA—'[a]t the summary judgment stage . . . the court may rely on a reasonably detailed affidavit.'").  A plaintiff cannot rebut the good faith presumption afforded to an agency's supporting affidavits through

"purely speculative claims about the existence and discoverability of other documents." *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991), quoting *Ground Saucer Watch, Inc. v. CIA*, 692 F.2d 770, 771 (D.C. Cir. 1981).

In a FOIA case, the burden rests with "the agency to sustain its action," *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981), quoting 5 U.S.C. § 552(a)(4)(B), and "the vast majority of FOIA cases can be resolved on summary judgment." *Brayton v. Off. of U.S. Trade Rep.*, 641 F.3d 521, 527 (D.C. Cir. 2011). *See also Wheeler v. CIA*, 271 F. Supp. 2d 132, 136 (D.D.C. 2003) (the agency "bears the burden of sustaining its decision to claim an exemption from disclosure"), citing 5 U.S.C. § 552a(g)(3)(A). The district court reviews agency decisions *de novo*. 5 U.S.C. § 552(a)(4)(B).

## ANALYSIS

### I. General FOIA Principles

FOIA requires federal agencies to disclose records upon request. *See* 5 U.S.C. § 552(a)(3)(A). The only exception is for records that fall into one, or more, of the nine narrowly construed exemptions. *See id.* § 552(b); *see also FBI v. Abramson*, 456 U.S. 615, 630 (1982). "[W]hen an agency seeks to withhold information, it must provide a relatively detailed justification" for the withholding, *Morley v. CIA*, 508 F.3d 1108, 1122 (D.C. Cir. 2007) (citation and internal quotation marks omitted), through a *Vaughn* index, an affidavit, or by other means. *See Gallant v. NLRB*, 26 F.3d 168, 172–73 (D.C. Cir. 1994), citing *Vaughn v. United States*, 936 F.2d 862, 867 (6th Cir. 1991). The general rule in FOIA cases is that:

> If an agency's affidavit describes the justifications for withholding the information with specific detail, demonstrates that the information withheld logically falls within the claimed exemption, and is not contradicted by contrary evidence in the record or by evidence of the agency's bad faith, then summary judgment is warranted on the basis of the affidavit alone.

*ACLU v. U.S. Dep't of Def.*, 628 F.3d 612, 619 (D.C. Cir. 2011).

After asserting and explaining the use of particular exemptions, an agency must release "[a]ny reasonably segregable portion of a record," 5 U.S.C. § 552(b), unless the non-exempt portions are "inextricably intertwined with exempt portions" of the record. *Johnson v. Exec. Off. for U.S. Att'ys*, 310 F.3d 771, 776 (D.C. Cir. 2002), quoting *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977). "In order to demonstrate that all reasonably segregable material has been released, the agency must provide a 'detailed justification' for its non-segregability," although "the agency is not required to provide so much detail that the exempt material would be effectively be disclosed." *Johnson*, 310 F.3d at 776, quoting *Mead Data*, 566 F.2d at 261.

In 2016, Congress added language to FOIA, mandating that "an agency shall withhold information under this section only if the agency reasonably foresees that disclosure would harm an interest protected by [the] exemption . . . or disclosure is prohibited by law." 5 U.S.C. § 552(a)(8)(A)(i). As the D.C. Circuit has explained, "Congress added the distinct foreseeable harm requirement to foreclose the withholding of material unless the agency can 'articulate both the nature of the harm [from release] and the link between the specified harm and specific information contained in the material withheld.'" *Reps. Comm. for Freedom of the Press v. Fed. Bureau of Investigation*, 3 F.4th 350, 369 (D.C. Cir. 2021) ("*Reporters Committee v. FBI*"), quoting H.R. Rep. No. 114-391, at 9 (2016). "In that way, the foreseeable harm requirement imposes an independent and meaningful burden on agencies." *Id.* (brackets and internal quotation marks omitted).

## II. Exemption 3

Under FOIA Exemption 3, agencies need not produces matters "specifically exempted from disclosure by statute," provided that such statute leaves no discretion on disclosure. 5 U.S.C. § 552(b)(3)(a)(i). "Under that exemption, the [agency] need only show that the statute claimed is one of exemption as contemplated by Exemption 3 and that the withheld material falls within the statute." *Larson v. Dep't of State*, 565 F.3d 857, 865 (D.C. Cir. 2009).

The Supreme Court has already made clear that the portions of the Census Act defendants cite are an appropriate basis for the denial of a FOIA request under Exemption 3. *See Baldrige v. Shapiro*, 455 U.S. 345, 355 (1982) ("Sections 8(b) and 9(a) explicitly provide for the nondisclosure of certain census data. No discretion is provided to the Census Bureau on whether or not to disclose the information referred to in §§ 8(b) and 9(a). Sections 8(b) and 9(a) of the Census Act therefore qualify as withholding statutes under Exemption 3."). So the only question here is whether the withheld material falls within those confidentiality provisions.

13 U.S.C. § 8(b) states that "the Secretary may furnish copies of tabulations and other statistical materials which do not disclose the information reported by, or on behalf of, any particular respondent." 13 U.S.C. § 9(a)(2) prohibits the agency from making "any publication whereby the data furnished by any particular establishment or individual under this title can be identified."

Plaintiff points out that its FOIA request, as narrowed, does not ask for the "information reported" or "data furnished" by any particular individual or respondent. Instead, plaintiff is requesting aggregated data: "the total population (number of individuals) imputed statewide by the Census Bureau for group quarters for each U.S. state." Pl.'s Mot. at 2 (internal quotation marks omitted). And defendants acknowledge that this request, on its face, would not require them to

disclose the information or data reported by any particular individual or respondent. *See* Defs.' Mot. at 2 ("The forced publication of any portion of the withheld data in this case without privacy protections may not, by itself, directly reveal the data disclosed by any particular respondent.").

The issue, according to defendants, is the impact that this disclosure would have on the strength of the larger dataset. They present a lengthy description of their plan to protect "the underlying raw data" from being "reconstruct[ed]" "through a series of mathematical algorithms." Defs.' Mot. at 6. Central to this process of protecting the census dataset is the allocation of "precise amounts of statistical noise" while maintaining some "invariants." *Id.* at 8–9 (internal quotation marks omitted). Noise infusion "introduces controlled amounts of error or 'noise' into the data." *Id.* at 3 n.4. Meanwhile, "[i]nvariants are data held constant." *Id.* at 9. In other words, when releasing information related to the 2020 Census, the Census Bureau publicizes some numbers as they were actually reported[3] to the agency. For example, "the state level population totals" are invariant, so each reported population of an individual state is the Census Bureau's actual count of each state's population. *Id.* Meanwhile, the agency publicizes other numbers slightly differently than how they were actually reported – these numbers have been infused with noise. For example, if this courthouse were to conduct a census, and it was determined that there were sixty-five law clerks working for the district court judges, that number might be reported as sixty-four, or sixty-six.

The goal of inserting deliberate amounts of noise is "preserving the overall statistical validity of the resulting data while introducing enough uncertainty into the data that attackers would not have any reasonable degree of certainty that they had isolated data for any particular

---

3   More precisely, the agency reports these numbers as it has calculated them after engaging in other techniques to increase the accuracy of their count, such as imputation.

respondent." Defs.' Mot. at 3 n.4, citing Abowd Decl. ¶ 24. Defendants argue that this process "protects privacy while maintaining the overall statistical validity of the data." *Id.* at 8.

This brings us to how releasing the requested information would affect this effort. Defendants note that "the group quarters population totals Fair Lines seeks" were *not* set as invariant for the 2020 Census. Defs.' Mot at 9. They argue that "[t]he inclusion of additional, as-yet unaccounted for invariants—e.g., in the form of the forced disclosure of unobscured data—would undermine the sensitive balance the Census Bureau has drawn," and increase the likelihood that third parties could circumvent defendants' efforts and reconstruct the dataset, discovering private information about particular respondents. *Id.* at 10, citing Abowd Decl. ¶ 60. In essence, the more data that is publicized as invariant and without the introduction of noise to protect anonymity, the easier it would be for someone to "reverse-engineer releases of aggregated data to identify individual data," especially in this modern era with the extreme amount of "computing power that exists today." *Id.* at 21.

It is important to emphasize in the wake of this technical discussion that the question to be determined is not whether an agency is following best practices to maintain privacy; the steps taken by the agency to maintain confidentiality are relevant only insofar as they relate to whether the requested information is "specifically exempted from disclosure by statute . . . in such a manner as to leave no discretion on the issue." 5 U.S.C. § 552(b)(3)(a)(i). In other words, the agency's privacy practices provide context for the legal question, but the direct question here is: does the Census Act prohibit disclosure of the requested information?

The first provision, 13 U.S.C. § 8(b), clearly does not prohibit this kind of disclosure. This conclusion is mandated by the structure of the sentence. 13 U.S.C. § 8(b) states that "the Secretary may furnish copies of tabulations and other statistical materials *which* do not disclose the

information reported by, or on behalf of, any particular respondent." (Emphasis added). The word "which" is a relative pronoun that refers to the earlier described "copies of tabulations and other statistical materials." *See Genus Lifesciences, Inc. v. Azar*, 486 F. Supp. 3d 450, 460 (D.D.C. 2020) ("[A] pronoun, relative pronoun, or demonstrative adjective generally refers to the nearest reasonable antecedent.") (citation and quotation marks omitted). So the most natural reading of the sentence is that disclosure is prohibited when the "copies of tabulations and other statistical materials" themselves would "disclose the information reported by, or on behalf of, any particular respondent." *See Ardestani v. I.N.S.*, 502 U.S. 129, 135 (1991) ("The starting point in statutory interpretation is the language of the statute itself"; courts must focus on "the most natural reading" and "plain and ordinary meaning" of each word) (quotation marks, brackets, and citations omitted).

Plaintiff has not asked for "raw census data," *Baldrige*, 455 U.S. at 358, submitted by any individual; the narrowed request calls for an aggregated count of "imputed" individuals – just the total number without any further elaboration or identification. The request is therefore outside of the 13 U.S.C. § 8(b) in two different ways. First, the furnished information would not include information that has been "reported." 13 U.S.C. § 8(b). The GQCI numbers are not reported by anyone; they are imputed, and therefore the source of the information is the agency itself. Second, the request does not ask defendants to "disclose" information that stems from "any particular respondent." 13 U.S.C. § 8(b). Again, the nature of imputation is that the numbers are not tethered to, let alone submitted by, any particular respondent. Because the question under 8(b) is whether the furnished information would itself disclose reported information – and it clearly would not – it is irrelevant whether disclosure could be part of the longer chain of events that defendants describe, in which such information could eventually be discovered by an unrelated third party.

13 U.S.C. § 9(b) is written differently, though.  The text of § 9(b) prohibits "any publication whereby the data furnished by any particular establishment or individual under this title can be identified."  The interpretation of this sentence hinges on the word "whereby."  Words in statutes are interpreted according to their "ordinary, contemporary, common meaning."  *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2363 (2019) (interpreting the word "confidential" in FOIA's Exemption 4 by asking what that term's ordinary, contemporary, common meaning was when Congress enacted the statute in 1966); *see also New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019) ("It's a fundamental cannon of statutory construction that words generally should be interpreted as taking their ordinary meaning at the time Congress enacted the statute.") (quotation marks, brackets, and ellipses omitted).  Contemporary meaning is determined by referencing dictionaries published around the time of enactment.  *See, e.g.*, *Food Mktg.*, 139 S. Ct. at 2363 (referencing dictionaries from 1963, 1961, and 1968 to interpret a 1966 statute); *New Prime*, 139 S. Ct. at 539 (distinguishing modern definitions of the term "contract of employment" from definitions contemporary with enactment).  This is the practice even with adverbs like "whereby"; for example, in *Begay v. United States*, 553 U.S. 137 (2008), the Supreme Court focused on the meaning of the term "otherwise" in the Armed Career Criminal Act of 1984 and cited to Webster's Third from 1961.  *Id.* at 144.

The relevant provision in 13 U.S.C. § 9(a)(2) was first enacted in 1954.  The text of this provision has not been changed by subsequent amendments.  *See* H.R. 9729, 83d Cong. § 9(a)(2)

(1954). Webster's New International Dictionary (2d ed. unabr. 1953) defines "whereby" as "by or through which; by the help of which; in accordance with which."[4]

This definition allows for some level of attenuation in the chain of causation. "By the help of which" and "by or through which," in particular, encompass situations in which an initial event sets a process in motion and an effect subsequently occurs. In that circumstance, the initial event helped bring about the later effect. Applied to this situation, the adverb "whereby' means that publication is prohibited if the publication could help "the data furnished by any particular establishment or individual . . . be identified," or through publication, "the data furnished by any particular establishment or individual . . . can be identified." 13 U.S.C. § 9(b).

The situation defendants describe – in which release would contribute to the ability of a third party to reconstruct the dataset – falls within the category of a situation "whereby," or "through which," "data furnished by any particular establishment or individual" could be identified. It would be through the publication of additional invariant data that the third party could more easily reconstruct data furnished by a particular individual.

This conclusion brings us to plaintiff's other argument: that regardless of how the statute is interpreted, the hypothetical attack imagined by defendants is not just far-fetched; it may even be impossible. *See* Pl.'s Mot. at 4 (criticizing defendants' "conjecture about a chain of unlikely (if not impossible events."). Plaintiff has supplied the analysis of Dr. Steven Ruggles, a professor of history and population studies, who concluded that "[t]here is no possible means by which the number of imputed cases could be used in combination with other statistics to allow for

---

4   This is the first definition; the dictionary provides two additional definitions, but neither is relevant (the second definition is for interrogative use and the third definition is labeled as "obscure except dialect").

identification of an individual." *See* Expert Report of Dr. Steven Ruggles, Appendix A to Ex. 2 to Pl.'s Mot. [Dkt. # 14-4] at 5 ("Ruggles Report"); *see also* Pl.'s Reply at 7 (defendants "stack speculation and conjecture about a hypothetical attack by a supercomputer").

Plaintiff asks the Court to accept its expert's opinion on the likelihood of harm the withholding is designed to prevent.[5] It insists that defendants' efforts regarding invariants and statistical noise are unnecessary. *See* Ruggles Report at 7. But the question when examining the sufficiency of an agency's reasoning in a FOIA affidavit is not whether the plaintiff has an equally or even more compelling theory, but rather, whether the agency's justification appears logical or plausible.[6] *See ACLU*, 628 F.3d at 619 ("Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'"), quoting *Larson,* 565 F.3d at 862. The agency has explained its thought process in an extremely detailed affidavit that evinces a good faith belief that the risk is real. *See generally* Abowd Decl. This belief is supported by

---

5    It is worth noting that plaintiff's expert, while clearly qualified to discuss the technical portions of this case, strays well beyond that and makes extensive legal arguments in his report, despite not being an attorney himself. *See, e.g.*, Ruggles Report at 3 (arguing that "the counts of imputed group quarters cases are not 'data furnished by any particular establishment or individual'"), 5 (explaining that a particular regulation "does not apply in this case"). This speculation did not contribute to the Court's understanding of the issues involved.

6    While the Court must review the agency's reasoning to confirm that its account is plausible, the level of technical expertise involved in weighing the risk of reconstruction is substantial, which is precisely why defendants' explanations – so long as they are logical and made in good faith – are entitled to a degree of deference. As another court observed in a non-FOIA context, "disputes regarding the Bureau's use of statistics in taking the census 'are best resolved not by the courts but by the Bureau itself, whose experience with prior censuses and expertise in the collection and analysis of statistical information render it especially qualified to make the appropriate decisions.'" *City of Los Angeles v. U.S. Dep't of Com.*, 307 F.3d 859, 876 (9th Cir. 2002), quoting *City of Philadelphia v. Klutznick,* 503 F. Supp. 663, 676 (E.D.Pa. 1980).

historical examples[7] in addition to theoretical reasoning. *See* Defs.' Mot. at 6–7. Given the agency's statutory responsibility to protect its own dataset, its greater level of familiarity with all of the numbers involved (including those that have been infused with noise for publication), and its lengthy deliberation about these very risks over the last ten years – including reconstruction simulations and "regular outreach with dozens of stakeholder groups," Defs.' Mot. at 7–8, – the agency's good faith determination that the risk is real suffices.[8] So while the Court understands the plaintiff's skepticism, and it is inclined to agrees that even defendants' submissions suggest that the risk is remote, it finds that the agency has carried its burden and is permitted to invoke FOIA Exemption 3 in declining to release the GQCI numbers.[9]

---

[7] Plaintiff's expert emphasizes that "there is not a single documented case of anyone outside the Census Bureau revealing the responses of a particular identified person using data from the decennial census." Ruggles Report at 7 (emphasis removed). But defendants offer examples from other publicly available datasets, and the absence of a previous successful reconstruction does not mean that reconstruction cannot occur in the future.

[8] Moreover, defendants need not show a "parade of horribles," as plaintiff puts it. Pl.'s Reply at 11. The statute forbids disclosure if "the data furnished by *any* particular establishment or individual . . . can be identified." 13 U.S.C. § 9(a)(2) (emphasis added). So even if a full reconstruction remains impossible, the burden is only on the agency to establish that "any" individual or establishment, *i.e.*, a single person, could be identified.

[9] One final issue to address is that there is no dispute regarding the adequacy of the search. Plaintiff's complaint arguably initially challenged the adequacy of defendants' search. *See* Compl. at 10 (plaintiff's prayer for relief, asking this Court to "Order Defendants to expeditiously conduct an adequate search for all records responsive to Plaintiff's Request in accordance with 5 U.S.C. § 552(a)(3)(C) at no cost to Plaintiff"). However, defendants moved for summary judgment on this issue, making specific arguments about the adequacy of their search, *see* Defs.' Mot. at 15–18, and plaintiff failed to respond, therefore waiving its right to argue that the search was inadequate. *See generally* Pl.'s Mot.; Pl.'s Reply. As a result, defendants are entitled to summary judgment as to this requested form of relief. *See United Mine Workers of Am. 1974 Pension v. Pittston Co.*, 984 F.2d 469, 478 (D.C. Cir. 1993) (failure to raise an argument during summary judgment briefing constitutes a waiver).

## CONCLUSION

Defendants' motion for summary judgment will be **GRANTED** and plaintiff's motion will be **DENIED**.

A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE: August 2, 2022